*55 PER CURIAM.
This is a termination-of-parental-rights case. On October 21, 2005, the Houston County Department of Human Resources petitioned to terminate A.D.B.H.’s parental rights to two of her children, J.B. and K.T. The Houston Juvenile Court held hearings on the petition on November 21, 2006, December 18, 2006, February 1, 2007, and March 13, 2007. The juvenile court terminated A.D.B.H.’s parental rights to J.B. and K.T. on April 5, 2007.
A.D.B.H. (“the mother”) gave birth to J.B. on August 20, 1999, and to K.T. on February 20, 2002. In October 2002, the mother lost custody of her children — J.B., K.T., M.D., and K.M., who are all half siblings — after the Houston County Department of Human Resources (“DHR”) concluded that the mother’s home was unsafe and unsanitary. By the next month, the mother’s father and stepmother (“the maternal grandparents”) had obtained physical custody of all four children. In March 2003, the maternal grandfather also obtained legal custody of the children. However, the mother subsequently regained custody of the children in June 2003. Upon regaining custody of the children, the mother received family services through DHR. Despite the mother’s having received those services, J.B. was transferred to a foster home in late 2003 because of severe behavioral problems.
Betty Faircloth, a DHR caseworker, testified that she became involved in the case in February 2004. At that time, three of the children were residing with the mother, while J.B., who had been diagnosed with attention deficit/hyperactivity disorder (“ADHD”) and had been prescribed numerous medications to control his behavior, remained in a foster home. J.B. would visit with the family every other weekend from Friday to Monday morning. Faircloth testified that the mother routinely telephoned her at 8:00 a.m. on Monday mornings to request that she come and get J.B. because the mother could not handle his behavior, which included insomnia, violence towards his half sisters, and a disrespectful attitude. In addition, on several occasions, the mother, when she was upset, requested that Faircloth take all four children. Faircloth testified, however, that the mother was able to handle the other three children and that she wanted all of her children, but that the mother simply could not handle any conflict with J.B. and that she often failed to properly administer his medications despite her knowledge of their importance.
Faircloth testified that she attempted to keep the children with the mother as long as possible but that the children were removed from the mother’s home in August 2004. Faircloth testified that the mother had failed to address the children’s chronic head-lice problem, that another family had moved into the mother’s home, and that the mother was leaving the children with neighbors or whomever would care for them. Faircloth testified that the home environment had become unsanitary and unsafe.
The three children who had been residing with the mother, including K.T., were initially transferred to a traditional foster home. In August 2004, M.D. was placed in the custody of her paternal grandmother. J.B. remained in a separate foster home until October 2004. Although the foster parents were able to control J.B. with the aid of his medications, the foster mother recommended in October 2004 that he be transferred to a therapeutic foster *56 home that could better address his special behavioral problems.
Linda Shirey, J.B.’s therapist, testified that she had counseled J.B. approximately every other week since April 12, 2004. According to Shirey, when J.B. started therapy, he was developmentally behind and withdrawn, his speech was very hard to understand, he was very emotional, and he had a very short attention span. Shi-rey described him as “a disturbed child.” Shirey testified that she had often attempted to integrate the mother into J.B.’s counseling sessions but that the mother had attended his sessions only twice. Shi-rey testified that the mother had a very negative effect on J.B., causing him “a lot of problems.” Faircloth testified that she considered J.B. to be a “target child,” who the mother, and even the half sisters, would blame for any problems the family encountered. During 2004, J.B. expressed sadness that he was not seeing his half sisters, but he never expressed similar feelings about not seeing his mother.
After the children were removed from her home in 2004, the mother received visitation rights that she exercised at DHR’s offices. Faircloth testified that the mother would visit with all four children at the same time on a weekly basis for one hour and that, during that time, the mother would spend approximately 40 minutes on her cellular telephone. Sometimes she would be talking to B.B.T., K.T.’s father, or to her parents, and she would pass the telephone to the children so they could speak with them briefly. However, the mother would often spend most of her time talking on the telephone rather than visiting with the children. Sometimes she would be talking to a man to whom she was engaged who had never met the children. Faircloth testified that she felt the mother spent an inappropriate amount of time talking on the telephone rather than visiting with her children.
Judy Whatley, another caseworker, testified that she had observed the visitations between the mother and the children in 2004. Whatley testified that during the visits the mother spent 20 minutes to 1 hour on her cellular telephone speaking to someone in Spanish and that, as a result, there was very little interaction between the mother and the children. Whatley testified that M.D., who was nine years old at the time, would basically take care of the younger children, taking them to the bathroom, unwrapping their hamburgers, tying their shoes, and cleaning up after them, while the mother talked on the telephone. Whatley testified that the mother constantly questioned the children about what color they were, insisting that they were brown, not white.
Faircloth testified that in 2004 and 2005 the mother would make intermittent progress with the children but that, for every step forward, she would take two steps back. Faircloth worked with the mother on a daily basis to assist the mother with correcting the problems DHR had identified. The mother never progressed to the point at which the children could be returned to her, however.
In March 2005, J.B. was able to leave the therapeutic foster home and move to the traditional foster home with K.T. and K.M. At trial, Shirey testified that J.B. had blossomed since leaving the therapeutic foster home and that he was now a developmentally normal and happy child. She testified, however, that J.B. still had no attachment to the mother. Shirey also testified that J.B. remained very close to his half sisters.
In March 2006, the juvenile court awarded custody of K.M. to her father, who lived in Atlanta. In the custody order the juvenile court indicated that “there is no or *57 dered visitation pending further order of the court.” Based on this order, DHR suspended all visitation between the mother and K.M., as well as the other children. The mother did not petition to reinstate visitation, and, as a result, the mother did not visit with the children after March 2006. Before that, the mother had been consistent with visitation and telephone calls, although she had occasionally missed a visit.
Whatley testified that DHR offered many services to the mother in an attempt to rehabilitate her, including providing day-care services, food stamps, child support, financial support, Christmas presents, transportation, counseling and psychiatric services, domestic-violence services, psychological evaluations, parent coaching, and services through Family Options, but, she testified, the mother was resistant to DHR’s efforts and failed to adjust to the needs of the children. Services were interrupted or halted because of noncompliance or other issues traceable to the mother.
According to Whatley’s testimony, during the time Whatley oversaw the case, the mother never showed any stability. What-ley testified that since 1995 the mother had worked at 35 different jobs, working the longest for a grocery store for 6 months. Since 1998, the mother had lived at 39 different residences; however, the mother had lived at the same address in Headland since August 2005, although sometimes her mail would stack up, indicating that she was not staying there. The mother was combative and threatening to her caseworkers and at least one foster parent, but not to her children. The mother had been barred from J.B.’s pediatrician’s office because of her failure to comply with the medical advice given for the children. The mother fed the children candy at visitations, although she had been cautioned that candy would make the children hyperactive. According to Whatley, the mother continued to be emotionally abusive to J.B., although she has never been physically abusive to any of her other children and the children had never exhibited any signs of physical injury. Whatley testified that the mother had not paid any child support since October 2005 and that a warrant had been issued for the mother’s arrest for her having failed to appear in court on the child-support matter. The mother had no criminal history.
The Henry County Department of Human Resources (“the Henry County DHR”) performed a home study on the mother’s residence in October 2005. According to Whatley’s testimony, the Henry County DHR did not approve placing the children into the mother’s home at that time. The Henry County DHR representative determined that the mother had lied about her employment, stating she was working when, in fact, she had been discharged four days before the home study because of her constant controversial conduct. The representative also found that the home had only one furnished bedroom. A few weeks before the initial termination-of-parental-rights hearing, a second home study was conducted. At that time, all three bedrooms were furnished and the home was clean. Whatley testified that it appeared that the mother had corrected the cleanliness problem. Faircloth testified that the mother had shown the ability to properly maintain the home when residing with her new husband, but that she had never shown the ability to properly maintain the home with all of her children residing with her.
Robert Nolan, a clinical psychologist, testified that he had evaluated the mother in January and February 2006. Nolan indicated that the mother had grown up in an unstable environment and that she had *58 been diagnosed and was being treated for bipolar disorder, a problematic, but treatable biological condition that causes altered mood patterns. He opined that the mother, due to her own unstable upbringing and her mental-health issues, would have difficulty providing a stable and nurturing environment for her own children. Although Nolan admitted that treatment of the mother’s bipolar disorder, if “wonderfully effective,” could possibly lead to the significant changes necessary for the mother to change her patterns and become a stable and nurturing influence to her children, such treatment, if both effective and fully complied with by the mother, only “might” benefit the mother. He noted that the mother had yet to admit that the situation in which she found herself was due, in large part, to her own poor judgment. In fact, Nolan pointed out that the mother blamed others for her children being taken into DHR’s custody. In his report, Nolan concluded that
“[g]iven the family history, the parent-child relationships are likely to be rather difficult to manage [as] a result of the instability of attachment and instability of home environment that has occurred, and the children will require a skillful, insightful, adaptive, and personally very stable parenting figure. These will be special needs children in terms of their emotional development and it will be critical that those needs are met during these earlier years of their lives, which will require that they have stable placements and attachments with nurturing parenting figures. It is not evident that then’ mother can be that person at this time.”
DHR placed into evidence a September 2006 letter from Dr. Jerlyn C. McLeod, an expert in child and adolescent psychiatry. Dr. McLeod had examined and treated J.B. Dr. McLeod diagnosed J.B. with “ADHD Combined Type, Mood Disorder, and Enuresis” for which he was treating J.B. with the prescription medications Ad-derall, Seroquel, and Remeron. Dr. McLeod stated that he was most concerned with J.B.’s emotional stability. Dr. McLeod felt that J.B. would remain stable only so long as he stayed out of the mother’s home and was kept in a structured and safe environment. Dr. McLeod felt J.B. could succeed in his current placement and that J.B. should continue psychiatric care and medication to avoid future hospitalizations. DHR also placed into evidence a December 2006 letter from Shirey in which she opined that J.B. had stabilized since his visitations with his mother had ceased and recommended that the mother have no further visitation with J.B. to assure his continued emotional and psychological well-being.
In September 2006, the mother was admitted to a local hospital emergency room for an intentional overdose of prescription medication. The emergency-room physician diagnosed the mother with bipolar disorder and felt she had attempted suicide after becoming despondent about not being able to see her children. A psychiatrist evaluated the mother and found that she was not an acute suicide risk, but he opined that the mother was quite unstable and was having difficulty functioning and making rational decisions. He diagnosed the mother with an adjustment disorder with major depression, along with medical noncompliance and parent-child relational problems.
The mother introduced into evidence two letters from Nathan Shimer, the mother’s counselor, dated November 2004 and December 2005. In the November 2004 letter, Shimer indicated that the mother was, at that time, compliant with her medication regimen, although the mother had deemed the medication insufficient to treat *59 the stress and worry generated by the dependency case. Shimer farther noted in the November 2004 letter that the mother was stable and that she should not become unstable again if she continued to take her medication regularly. In the December 2005 letter, Shimer opined that the mother was a strong advocate for her children whose maternal instinctual responses had been misread by some. He believed the mother loved and worried about her children, but not always in a conventional manner. He described the mother as a typical Latino mother, noting that although she was not Latino by birth, she had been assimilated into the Latino culture. Shimer opined that it would be in the children’s best interests to be returned to the mother, who he described as a loving and nurturing parent.
The mother testified that in February 2007 she was not employed but that she occasionally worked as a translator for the City of Dothan and also cleaned houses. She said that she lived in Headland with her third husband, who was a construction worker. She earned $180 from the City of Dothan for the 11-month period immediately before September 2006. The mother testified that she was not actively seeking employment but stated that she had filed for Social Security disability benefits. Despite her unemployment, the mother testified that she had paid some child support since October 2005.
The mother testified that she had been diagnosed with bipolar disorder and attention deficit disorder. A local psychiatrist was actively treating her for those conditions at the time of the hearing in February 2007. The doctor had prescribed Ritalin to help the mother’s attention, Seroquel to help stabilize the mother’s moods, and Lamictal to treat the mother’s bipolar disorder. The mother also used the prescription medications Ambien as a sleep aid and Xanax for her nerves, as needed. The mother testified that her medications helped her focus and that she did not know whether she would have to continue taking the medications in the future. However, she testified that her dosages were stronger at the time of the February 2007 hearing than they had been previously. The mother was also undergoing therapeutic counseling. The mother admitted that she had had suicidal thoughts in September 2006, but she denied that she had attempted suicide at that time or in 2004 or 2005.
The mother testified that since March 2006 she had had no contact with DHR, except during Christmastime of 2006, when she asked her attorney to have DHR specify any requirements she needed to meet in order to regain custody of her children. The mother testified that she had done everything she had been asked to do and everything that she knew to do to regain custody. The mother testified that she kept a clean house and that, although DHR had never asked her to maintain stable housing, she had been living in the same residence for over two years. The mother testified that she had addressed DHR’s concerns about having multiple family members living with her. The mother testified that she was only $700 in arrears on her child support and that she was paying on those arrears. The mother also testified that she took her medication to appease DHR and to address her emotional problems from having her children taken away from her. The mother testified that she had attended almost every visitation and that she had telephoned DHR when she could not attend the visitations because of sickness or other problems. The mother admitted that she had not contacted the children since March 2006, but she said she had done so because DHR had told her she would be arrested if she did. The mother denied being loud and threatening while *60 visiting with the children at DHR’s facilities. The mother denied that she had asked Faircloth to pick up J.B. because she could not control him.
The mother testified that the maternal grandparents were willing to take custody of the children. The maternal grandparents had acted as custodians for all four children in 2002 and 2003, and, according to the mother’s testimony, DHR had never complained about their conduct or expressed any concern about the maternal grandfather’s behavior. At the time of the termination hearings, the maternal grandfather was on active duty with the Army. Although he was physically present in the state at the time of the February 2007 hearing, the maternal grandfather was on emergency leave to attend to the maternal stepgrandmother, who was in the hospital recuperating from hip surgery. Neither of the maternal grandparents had filed a petition to obtain custody of any of the children.
The juvenile court entered separate but largely identical judgments regarding J.B. and K.T., finding in each judgment that the respective child was dependent, that the mother was unable or unwilling to provide a stable home for that child, and that the mother was unable to care for or to provide for that child. The juvenile court further found that it and DHR had considered less drastic measures than termination of the mother’s parental rights, but it concluded that there was no other reasonable and viable alternative to termination. Finding that it was in the best interests of both children, the juvenile court terminated the mother’s parental rights to J.B. and K.T.[1] The mother appeals from both judgments.
The mother first argues that the judgments terminating her parental rights were not supported by clear and convincing evidence because the evidence showed that she was in the process of making the necessary steps to reunite with the children and that her current conditions indicated that she was able and willing to discharge her parental responsibilities to and for the children. The mother secondly argues that the judgments finding that there was no less drastic viable alternative to termination of her parental rights were unsupported by clear and convincing evidence because the juvenile court could have placed custody of the children with the maternal grandparents.
“ ‘The right to maintain family integrity is a fundamental right protected by the due process requirements of the Constitution. Pursuant to this right, Alabama courts recognize a presumption that parental custody will be in the best interests of a child. This prima facie right of a parent to custody of his or her child can only be overcome by clear and convincing evidence that permanent removal from the parent’s custody would be in the child’s best interests, but the primary consideration in any proceeding to terminate parental rights is always the best interests and welfare of the child. In making that determination, the court must consider whether the parent is physically, financially, and mentally able to care for the child. If the court finds from clear and convincing evidence that the parent is unable or unwilling to discharge his or her responsibilities to and for the child, his or her parental rights can *61 then be terminated, pursuant to [Ala. Code 1975,] § 26-18-7(a)
“Bowman v. State Dep’t of Human Res., 534 So.2d 304, 305 (Ala.Civ.App.1988) (citations omitted).
“A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990).”
B.M. v. State, 895 So.2d 319, 330-31 (Ala.Civ.App.2004).
As noted above, a juvenile court’s judgment terminating parental rights must be supported by clear and convincing evidence. Bowman v. State Dep’t of Human Res., 534 So.2d 304, 305 (Ala.Civ.App. 1988). “Clear and convincing evidence” is “ ‘[ejvidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’ ” L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting Ala.Code 1975, § 6-11-20(b)(4)). The juvenile court’s factual findings, based on evidence presented ore tenus, in a judgment terminating parental rights are presumed correct. R.B. v. State Dep’t of Human Res., 669 So.2d 187 (Ala.Civ.App.1995).
Section 26-18-7(a), Ala.Code 1975, a part of the 1984 Child Protection Act (“the CPA”), § 26-18-1 et seq., Ala.Code 1975, specifies grounds for terminating parental rights:
“If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents.”
In deciding whether a parent is unable or unwilling to discharge his or her responsibilities to and for the child, the juvenile court must consider such factors as:
“(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
“(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
[[Image here]]
“(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.”
Ala.Code 1975, § 26-18-7(a). Additionally, when the child is not in the physical custody of the parent, the juvenile court shall consider:
“(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
“(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed *62 private child care agency, and agreed to by the parent.
“(3) Failure by the parents to maintain consistent contact or communication with the child.
“(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
Ala.Code 1975, § 26-18-7(b).
In this case, the juvenile court originally removed the children from the mother’s custody because she had failed to maintain a clean and suitable environment for the children. Although the children subsequently reunited with the mother, in late 2003 J.B. was transferred to a foster home because of the mother’s inability to control his behavior and her inability to adapt to his special behavioral needs, including complying with his medication schedule. By August 2004, all the children had been removed from the mother’s home because of her failure to correct their chronic head-lice problem, the overcrowded conditions of the home, the unsafe and unsanitary conditions of the yard and the home, and the mother’s delegation of her parental responsibilities to whomever would care for the children. DHR later faulted the mother for failing to maintain steady employment and a stable residence.
As pointed out in the mother’s brief on appeal, and by the mother’s attorney at trial, by the time of the final hearing, the children no longer suffered from chronic head lice, the mother had remarried, the mother had maintained a clean and suitable home for over two years, the mother had cleared her residence to make room for her children, and the mother had indicated a willingness to care for the children by taking her medication to control her mood and attention problems. Based on this evidence, all of which was uncontra-dicted, the mother argues that she was making strides toward curing all the deficiencies that had led to the initial disruption of the family. The mother notes that “the existence of evidence of current conditions or conduct relating to a parent’s inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.” D.O. v. Calhoun County Dep’t of Human Res., 859 So.2d 439, 444 (Ala.Civ.App. 2003). The mother argues that, pursuant to D.O., a juvenile court errs if it terminates parental rights prematurely at a time when the parent is making progress toward changing his or her circumstances and removing the barriers to reunification with the child. D.O., 859 So.2d at 444.
The problem with the mother’s argument is that she assumes that, because she had thoroughly addressed some of the issues that had endangered the children during the more than two-year period in which DHR had their custody, she was making significant progress toward reunification with the children. Both of the DHR representatives testified that, after DHR had obtained custody of the children, DHR’s focus shifted away from the conditions of the home that had necessitated the removal of the children and toward the manner in which the mother interacted and treated the children. Having witnessed the mother’s visitations with the children, Faircloth and Whatley concluded that the mother was emotionally abusive to J.B. and was neglectful of the other children, seeming to be more concerned with her own personal life than the needs of the children, conclusions they supported at trial with clear and convincing evidence. DHR attempted to address these problems *63 by providing counseling, parenting services, and other family services for the mother, to no avail. At the end of the process, the mother had identified a major factor in her problems, her bipolar disorder, and had stabilized her mood swings through medication, but she was still in a condition that led one mental-health professional to testify that the mother could not provide the necessary stability to properly care for and nurture the children and that led two others to opine that it would be detrimental to J.B. to be reunited with the mother. Although another mental-health professional indicated that the mother could and should regain custody of the children, it is the duty of the juvenile court to weigh the evidence and determine which expert opinion it believes. See State ex rel. D.K. v. R.T., 599 So.2d 627, 628 (Ala.Civ.App.1992).
Nolan indicated that the mother’s psychiatric condition “might” be controlled sufficiently with medication to the point that she could resume custody of the children. “At some point, however, the child’s need for permanency and stability must overcome the parent’s good-faith but unsuccessful attempts to become a suitable parent.” M.W. v. Houston County Dep’t of Human Res., 773 So.2d 484, 487 (Ala. Civ.App.2000). When the juvenile court terminated the mother’s parental rights, J.B. had been in DHR’s custody and in various foster homes for almost four years and K.T. had been in foster care for almost two and one-half years. J.B. and K.T. had seen their two half siblings transferred to suitable relatives with stable home environments. The mother had been given ample time to rehabilitate herself so that she could regain custody of J.B. and K.T. The children should not have to spend further time in an uncertain home situation based on the mere hope that the mother may someday overcome her psychological inability to properly parent them. The juvenile court did not err in failing to grant the mother additional time to rehabilitate.
The mother further argues that the juvenile court erred by failing to consider viable alternatives to the termination of her parental rights. She argues that awarding custody to the maternal grandparents is a suitable alternative to the termination of her parental rights to both J.B. and K.T. DHR argues that the juvenile court properly rejected the maternal grandparents as viable relative resources because there was no evidence indicating that the maternal grandparents had maintained any relationship with the children and that the juvenile court had properly concluded that it would not be in the children’s best interest to be placed with the maternal grandparents.
We have often cited Ex parte Beasley to explain the two-pronged test for terminating parental rights.
“A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990).”
B.M. v. State, 895 So.2d at 331. Our supreme court has continued to adhere to the two-prong test, reversing a judgment terminating parental rights based on the failure to properly investigate and consider potential viable alternatives in cases like Ex parte T.V., 971 So.2d 1 (Ala.2007), and Ex parte J.R., 896 So.2d 416 (Ala.2004).
The mother insists that DHR failed to meet the second prong of that test, “the viable alternatives prong,” because, the mother says, the maternal grandparents *64 could take custody of the children as a viable alternative to terminating her parental rights. The record reflects that the maternal grandparents had custody of the children from November 2002 until June 2003. According to the court report in evidence,[2] the children suffered from continued bouts of head lice during their stay with the maternal grandparents. In addition, the court report states that the daycare facility at which the children were enrolled reported that the children had problems with personal hygiene to the extent that workers actually bathed the children and shampooed their hair after they arrived at the day-care facility. Although the maternal stepgrandmother was not employed during the time the children were in her care, the children were enrolled in full-time day care and the maternal stepgrandmother was sometimes 15 to 30 minutes late in picking the children up from day care.
At the time of the termination hearings, the maternal grandfather was deployed overseas on active military duty. The maternal stepgrandmother injured her hip and had surgery shortly before the February 2007 hearing, and she had reinjured herself in a fall on the date of the March 2007 hearing. DHR had ruled out the maternal grandparents as potential relative resources as a result of their earlier experience as custodians of the children; the maternal grandfather’s deployment overseas and the maternal stepgrandmother’s hip surgery and continued health concerns are further reasons that awarding custody to the maternal grandparents was not a viable alternative to the termination of the mother’s parental rights. The evidence supports the juvenile court’s finding that awarding custody to the maternal grandparents was not a viable alternative to termination in the present case.
Because DHR proved, by clear and convincing evidence, grounds for termination of the mother’s parental rights and that there existed no viable alternatives to termination, we affirm the judgment of the juvenile court.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, J., concur.
BRYAN, J., concurs specially, with writing, which THOMAS, J., joins.
THOMAS, J., concurs specially.
MOORE, J., concurs in part and concurs in the result, with writing.

. The juvenile court also terminated the parental rights of the children's respective fathers. This court has already considered the appeal of B.B.T., K.T.’s father. See B.B.T. v. Houston County Dep't of Human Res., 985 So.2d 479, 480 (Ala.Civ.App.2007). J.B.’s father did not appeal the termination of his parental rights.

. The mother’s attorney objected to the admission of the court report at the commencement of the termination trial. DHR's attorney stated that he was not offering the court report and directed the juvenile court's attention to the fact that the earlier court reports had been admitted into evidence at earlier proceedings. The juvenile court made no comment. The mother's attorney failed to object at this point and raised no objection that the earlier admission of the court reports in other proceedings would not permit the court to consider those documents as evidence in the termination trial. See Rule 105, Ala. R. Evid. (indicating that, in situations in which evidence is admissible for one purpose but not another, a court, “upon request, shall restrict the evidence to its proper scope (emphasis added)). Compare Ala.Code 1975, § 12 — 15—65(f) (requiring evidence in an adjudicatory phase of a dependency proceeding to be "competent, material, and relevant") with § 12-15-65(h) (permitting the juvenile court to consider "all relevant and material evidence,” even if it is "not competent in a hearing on the petition" in disposition hearings); see also Y.M. v. Jefferson County Dep’t of Human Res., 890 So.2d 103 (Ala.Civ.App. 2003), aff'd, Ex parte State Dep't of Human Res., 890 So.2d 114 (Ala.2004).