STUART, Justice
(concurring specially).
This Court previously granted the petitions filed by J.M.P. (“the father”) and M.G.N. (“the mother”) (hereinafter collectively “the parents”) seeking certiorari review of the Court of Civil Appeals’ judgment affirming separate judgments entered by the Mobile Juvenile Court terminating both of their parental rights as to their six children. I concur in this Court’s decision to quash the previously granted writs; I write specially to emphasize that the goal of reuniting children with their parents must be balanced by the rights of those children to permanency and appropriate living circumstances.
It is clear from the unambiguous language of the Alabama Juvenile Justice Act, § 12-15-101 et seq., Ala.Code 1975 (“the AJJA”), that juvenile courts considering matters affecting the custody of children must show “a preference at all times for the preservation of the family....” § 12-15-101(b)(8), Ala.Code 1975. Moreover, when circumstances nevertheless require the removal of a child from his or her parents’ custody, the AJJA mandates that juvenile courts act to reunite that child with his or her parents “as quickly and as safely as possibly ... unless reunification is judicially determined not to be in the best interests of the child.” § 12-15-101(b)(3), Ala.Code 1975. In such a situation — when reunification is determined not to be in the best interests of the child — the AJJA provides that parental rights may be terminated; § 12-15-319(a), Ala.Code 1975, provides:
“If the juvenile court finds from clear and convincing evidence,[1] competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents.”
In the present case, the Department of Human Resources (“DHR”) became involved with the family in April 2008 when one of the children was taken to the hospital following an apparent antihistamine overdose and the parents later left the hospital with the child contrary to the recommendation of the on-duty medical *289 personnel. An investigation was conducted by DHR following the hospital’s referral, and, based on concern over the children’s health and hygiene, the state of the family’s home, and the mother’s behavior and her refusal to take a drug test, DHR made the decision to remove the children from the parents’ custody.[2] When informed of that decision, the mother admitted to using marijuana and methamphetamine; the father also later admitted that he used methadone to self-medicate for arm pain so that he could work.
In accordance with the AJJA, DHR’s initial goal was to work toward reunifying the children with the parents. To help achieve that end, DHR set goals with the parents and worked to help them become drug-free, to find suitable housing, and to gain the ability to provide for their children. However, at a May 2009 individualized-service-plan meeting at which both parents were present, DHR made the decision to change its plan to termination of parental rights based on the parents’ lack of progress toward reaching the goals DHR had set.[3] The juvenile court subsequently entered orders noting that the new permanency plan for the children was adoption.
In March 2010, DHR filed petitions to terminate the parents’ parental rights. The petitions generally alleged that the parents had previously failed to provide for the material needs of the children, that they were unable to do so at the present time, and that it was unlikely that they would be able to do so at any time in the foreseeable future. A hearing on the petitions was held in January 2012, and, in April 2012, the juvenile court entered orders terminating the parents’ rights to six of their children.
The juvenile court’s decision is supported by clear and convincing evidence. During the four-year period between the time the children were removed from the home and the time their parental rights were terminated, the parents failed to demonstrate that they were able “to discharge their responsibilities to and for the children].” § 12-15-319(a). Parents’ responsibilities toward their children include the responsibilities “to provide adequate food, medical treatment, supervision, education, clothing, [and] shelter.” § 12-15-301, Ala.Code 1975 (defining “neglect” as the failure to provide those items). At the termination-of-parental-rights hearing, the juvenile court heard evidence indicating that the parents have moved at least 6 times, and possibly more than 10 times, during those 4 years, alternately living with relatives “a few nights here and there,” in different vehicles, in a one-room camper, and most recently in a three-bedroom house whose ownership was apparently the subject of litigation. When a DHR representative attempted to inspect that house before the termination-of-parental-rights hearing, she was refused access beyond the living room. At the termination-of-parental-rights hearing, the father acknowledged that the house “needs a bunch of work” and was not yet a stable and safe place to live, though he expressed optimism that it would not take him long to make it so. The mother also testified that there was not adequate room for the children. Thus, although the par *290 ents had been given approximately four years to demonstrate an ability to provide adequate shelter for their children, the clear and convincing evidence indicates that they had been unable to do so.
The evidence also indicates that the parents lacked the ability to provide otherwise for their children, including at least two with special needs. The mother testified at the termination-of-parental-rights hearing that she could not work because of a problem with her birth certificate and an inability to obtain proper identification. DHR had contacted the State of Arizona, where the mother was apparently born, on her behalf to determine how to resolve that problem and then shared the information obtained with the mother; however, the mother has apparently failed to act on that information to date. Although apparently willing to work, the father testified that he is essentially unable to obtain anything more than irregular work as a laborer because of his lack of education and dental problems. He also testified that he has eyesight problems, carpal-tunnel syndrome, and either a tumor or cyst in his arm. The father’s ability to work is further impaired by the fact that his driver’s license has been suspended, although he acknowledged that, even though he has already been incarcerated once for traffic tickets, he continues to operate an unregistered and uninsured vehicle without a license. Finally, although the parents receive some government benefits, they acknowledge that the mother’s benefits have been reduced as a sanction for fraud, apparently as a result of claiming .children that either did not exist or that she did not have custody of; the parents attribute the situation to a “mix up in the paperwork.”
Based on this and other evidence in the record, I agree with the juvenile court and with the Court of Civil Appeals that there is clear and convincing evidence that the parents are currently unable to discharge their responsibilities to and for their children. Moreover, their current circumstances, coupled with their past history, indicate that that inability is unlikely to change in the foreseeable future. See A.R. v. State Dep’t of Human Res., 992 So.2d 748, 760 (Ala.Civ.App.2008) (stating that court must consider parents’ current conditions or conduct relating to their ability to care for their children but may also consider the past history of the family).
To date, the children have now been out of the parents’ custody for over five years. DHR initially worked to reunite the family following the removal of the children in April 2008, attempting to help the parents stop using drugs by recommending treatment programs and even arranging medical care for the father to help resolve pain in his arm for which he was self-medicating with methadone. DHR also arranged parenting classes, which the parents completed, and psychological evaluations, which they did not complete because, they testified, the juvenile court did not specifically require them to do so. Finally, DHR attempted to help them better their financial and housing situation by trying to help the mother obtain identification so she could obtain legal employment and by providing information and an application for low-income housing, which the mother testified she completed but which was unsuccessful, presumably because of the parents’ poor credit rating. Although the parents appear to have made some progress toward becoming drug-free since April 2008,[4] DHR’s efforts to rehabilitate *291 the parents still have not enabled the parents to obtain stable housing or the means to provide for their children. That failure, however, is not due to a lack of reasonable efforts by DHR, which I believe fulfilled its duty to use reasonable efforts to reunite the family. See, e.g., T.B. v. Cull-man Cnty. Dep’t of Human Res., 6 So.3d 1195, 1198 (Ala.Civ.App.2008) (“Generally speaking, when a child is removed from the parental home, DHR has a duty to use reasonable efforts to reunite the family”).
In M.A.J. v. S.F., 994 So.2d 280, 290-91 (Ala.Civ.App.2008), the Court of Civil Appeals stated:
“In 1998, our legislature, in response to the passage of the federal Adoption and Safe Families Act (‘the ASFA’), enacted § 12-15-62(c), which requires juvenile courts to hold a permanency hearing to determine a child’s disposition within 12 months of the date the child first entered foster care. See A.D.B.H. v. Houston County Dep’t of Human Res., [1 So.3d 53, 69 (Ala.Civ.App.2008) ] (Moore, J., concurring in part and concurring in the result). Based on similar statutory provisions in their states, many other courts have concluded that their legislatures have established 12 months as a presumptively reasonable time for a parent to rehabilitate so as to be able to reunite -with the child. See Kurtis A. Kemper, Annotation, Construction and Application by State Courts of the Federal Adoption and Safe Families Act and Its Implementing State Statutes, 10 A.L.R.6th 173, 193 (2006). We have recognized that, ‘[a]t some point, ... the child’s need for permanency and stability must overcome the parent’s good-faith but unsuccessful attempts to become a suitable parent.’ M.W. v. Houston County Dep’t of Human Res., 773 So.2d 484, 487 (Ala.Civ. App.2000). Consistent with that statement, and the purpose behind the ASFA and § 12-15-62(c) to ‘ensure “that children are provided a permanent home as early as possible,” ’ A.D.B.H., 1 So.3d at 69 (Moore, J., concurring in part and concurring in the result) (quoting Kem-per, 10 A.L.R.6th at 193), we hold that when DHR timely exerts reasonable rehabilitation and reunification efforts, the parents generally shall have 12 months from the date the child enters foster care to prove that their conduct, condition, or circumstances have improved so that reunification may be promptly achieved.”
See also T.G. v. Houston Cnty. Dep’t of Human Res., 39 So.3d 1146,1152 (Ala.Civ. App.2009) (“[Maintaining a child in foster care indefinitely is not a viable alternative to termination of parental rights.”), and N.A. v. J.H., 571 So.2d 1130,1134 (Ala.Civ. App.1990) (stating that “at some point, [children’s] need for permanency must outweigh repeated efforts by DHR to rehabilitate the [parent]”). In the instant case, I believe the juvenile court correctly determined, after approximately 4 years, well beyond the presumptively reasonable 12-month timeline described in M.A.J., that the children’s need for permanent and stable and appropriate living circumstances outweighed any other considerations.
In Ex parte G.C., 924 So.2d 651, 661-62 (Ala.2005) (Stuart, J., concurring specially), I recognized the inherent rights of parents concerning their children, while simultaneously acknowledging the limits inherent to those rights, stating:
*292 “Children are a gift from God.[6] They need and deserve the love and support of both their mothers and their fathers. Parents have God-given rights concerning their children, which are and should be protected by state government. With every right we possess, however, comes responsibility. Rights must be claimed and responsibilities assumed or they may be forfeited.
“Parental rights are counterbalanced by the responsibilities parents assume with those rights. See Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). The father in this case lost his prima facie right to custody because of his failure to timely assume his responsibilities as a father.
“ «Psalms 127: 3-5.”
In the instant case, the clear and convincing evidence establishes that the parents— though willing — are unable to assume and fulfill their responsibilities as parents. Accordingly, I concur to quash the writ, effectively affirming the judgments of the Court of Civil Appeals and the juvenile court.
BRYAN, J., concurs.

. Clear and convincing evidence is "[evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.” § 6 — 11—20(b)(4), Ala.Code 1975.

. At this time the parents had five children. The oldest of these children is not part of these proceedings, and DHR is pursuing permanent relative placement for him. Subsequent to the initial removal of children in April 2008, the mother has given birth to two more children, who were also removed from the home.

. At that same meeting, the father refused to undergo a drug screen and the mother tested positive for marijuana.

. The mother was enrolled in a methadone-treatment program at the time of the termination-of-parental-rights hearing. The father had been enrolled in the' program but was forced to drop out when he was incarcerated. He testified that he was now drug-free; how *291 ever, after testing positive for methadone in 2009 — before he entered the program — he did not show up for any further drug screens DHR had scheduled for him. A DHR representative testified that DHR eventually stopped scheduling drug screening after the decision was made to terminate parental rights.

. Fragile X syndrome is a condition similar to autism.