N.J. ("the mother") appeals from the Madison Juvenile Court's judgment of December 21, 2006, terminating her parental rights to her four children. We affirm.
 Issue
The mother contends that the juvenile court erred in finding that there was no viable alternative to termination of her parental rights. Specifically, the mother argues that the juvenile court erroneously found that the children's maternal grandmother was not a suitable person to assume custody of the children. *Page 999 
 Standard of Review
A juvenile court's finding that there is no viable alternative to termination of parental rights must be based on clear and convincing evidence. D.O. v. Calhoun County Dep't of HumanRes., 859 So.2d 439, 443 (Ala.Civ.App. 2003). "`[C]lear and convincing evidence' is `[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'" Ex parte T.V., 971 So.2d 1, 9 (Ala. 2007) (quoting L.M. v. D.D.F., 840 So.2d 171, 179
(Ala.Civ.App. 2002), citing in turn Ala. Code 1975, § 6-11-20(b)). When reviewing a finding of fact that the law requires to be supported by clear and convincing evidence, this court is required to conduct "a careful search of the record,"Moore v. State Dep't of Pensions Sec,470 So.2d 1269, 1270 (Ala.Civ.App. 1985), comparing the supporting evidence and any countervailing evidence, to assure that the finding is supported by evidence that is sufficiently clear and convincing. See KGS Steel, Inc. v. McInish, [Ms. 2040526, June 30, 2006] ___ So.2d ___ (Ala.Civ.App. 2005).See also Columbus v. State Dep't of Human Res.,523 So.2d 419, 421 (Ala.Civ.App. 1987); L.M. v. D.D.F.,840 So.2d at 179 ("Due to the serious nature of the action of terminating a parent's parental rights, this court must carefully review the unique set of facts established in each case in determining whether clear and convincing evidence was presented to support the termination of those rights."); andSantosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388,71 L.Ed.2d 599 (1982) (holding that due process allows parental rights to be terminated only upon clear and convincing evidence).
 The Evidence
The evidence relevant to the issue before the court indicates that the Madison County Department of Human Resources ("DHR") assigned several caseworkers to assist in reunifying the children with the mother. In September 2004, while attempting to reunify the family, DHR placed the children with the children's maternal grandmother after a favorable home evaluation of her one-bedroom apartment. A DHR caseworker had interacted with the maternal grandmother numerous times during Individual Service Plan ("ISP") meetings. That DHR caseworker testified that the maternal grandmother always expressed concern and love for her grandchildren and that they appeared comfortable around her. According to the caseworker, the maternal grandmother expressed concern over allegations that the mother had physically abused the children, but she seemed to deny the truth of those accusations even after the mother was convicted of three counts of child abuse. The DHR caseworker testified that she did not have any problem placing the children with the maternal grandmother in September 2004 because, she said, at the time the grandmother appeared to be able to meet the emotional, financial, and other needs of the children despite the fact that she was not working. However, the DHR caseworker was not aware that a prior home evaluation regarding the maternal grandmother had not been favorable.
The DHR caseworker testified that within days of acquiring custody of the children in September 2004, the maternal grandmother became ill and was hospitalized. According to the caseworker, the maternal grandmother telephoned her oldest daughter and asked her to care for the children, but the children ended up being cared for by the mother even though the maternal grandmother understood that the mother was not supposed to have custody of the children. Based on those circumstances, *Page 1000 
the caseworker realized that the maternal grandmother was not an appropriate placement. After a hearing, the juvenile court ordered the children removed from the maternal grandmother's home. DHR thereafter placed the children in foster care and did not take any further action to return the children to the custody of the maternal grandmother.
The maternal grandmother testified that she had taken care of the children for long periods of time before they were removed from the custody of the mother. During that time, she stated, she had never noticed any signs of physical abuse and the children had never complained that the mother abused them. She admitted, however, that after DHR removed the children, she did see marks on their bodies that were clearly visible. The maternal grandmother testified that she would not allow anyone, including the mother, to harm her grandchildren, and that she would have reported the mother to DHR if she had suspected a problem.
The maternal grandmother testified that she had three children, all of whom had been involved with DHR because of child-rearing problems. She had attempted to gain custody of her son's child, but DHR had conducted a home evaluation that was not favorable. That home evaluation occurred before the favorable home evaluation that was conducted in 2004.
The maternal grandmother testified regarding her September 2004 hospitalization. She testified that, after the children were placed with her, she injured her leg and was hospitalized. The maternal grandmother testified that she telephoned her oldest daughter and asked her to care for the children while she was hospitalized. Due to circumstances beyond the maternal grandmother's control, however, the mother got the children. The maternal grand-mother testified that she did not intend for the mother to get the children while she was hospitalized and that she understood that the mother was not to have custody of the children. However, the maternal grandmother did not tell the oldest daughter to keep the children from the mother. The maternal grandmother testified that DHR had not given her a number so that she could contact a DHR employee to get the children in the event of an emergency.
At the time of the termination hearing, the maternal grandmother was employed and had been residing for approximately one month in a three-bedroom home. She had been regularly visiting with and giving presents to the children since they had been removed from her home. The maternal grandmother testified that she was willing and able to take custody of the children and to properly care for them. She testified that her leg problem had been resolved and was no longer a barrier to her ability to care for the children. She also testified that her general health was good even though she had recently lost a noticeable amount of weight.
The maternal grandmother testified that she felt the mother had been rehabilitated to a degree and that she trusted the mother. She testified that she would protect the children from the mother and would not intentionally allow the mother to resume custody. However, the maternal grandmother testified that she did not know how she would prevent the children from ending up with the mother in the event of another emergency.
 Applicable Law
In Roe v. Conn, 417 F.Supp. 769 (M.D.Ala. 1976), the court held that the fundamental right to family integrity protected by the United States Constitution protects a parent from state interference with his or her relationship with his or her child. The court said: *Page 1001 
 "States, in the exercise of their inherent police powers, may abrogate such rights only to advance a compelling state interest and pursuant to a narrowly-drawn statute restricted to achieve only the legitimate objective. See, e.g., Roe v. Wade, 410 U.S. 113, 155, 93 S.Ct. 705, 35 L.Ed.2d 147
(1973). It is not disputed that the State of Alabama has a legitimate interest in the welfare of children. Minor intrusions into the affairs of the family may be permitted when the State has reason to believe that a child's best interest is at stake. In such cases, various options and alternatives are available to the State to achieve its objective of child protection. One possibility might be a requirement that the parents attend seminars and weekly counselling sessions on child care and the responsibilities of parenthood. Another situation might warrant supervision of the parents by a welfare counselor or the placing of a neutral person — such as an aunt — in the home to serve as a bridge between the parents and the child. The State's interest, however, would become `compelling' enough to sever entirely the parent-child relationship only when the child is subjected to real physical or emotional harm and less drastic measures would be unavailing."
417 F.Supp. at 779 (emphasis added). The court concluded that the Constitution required the state to prove that the child would be harmed "in a real and substantial way" if the child was not permanently separated from the parent before the state could terminate the parent's parental rights. Id. The court declared the "neglected child" provision of Alabama's juvenile code to be unconstitutional for allowing termination of parental rights without proof of real harm to the child or proof that other viable alternatives had been considered.
After Conn, this court noted that the legislature had replaced the old "neglected child" statute with a new law entitled the Alabama Juvenile Justice Act that resolved the constitutional concerns raised in Conn by expressly identifying and requiring consideration of, viable alternatives to termination of parental rights. See Hunley v. HoustonCounty Dep't of Pensions Sec, 365 So.2d 81, 84 n. 1 (Ala.Civ.App. 1978). Alabama Code 1975, § 12-15-71(a), a part of the Alabama Juvenile Justice Act, permits a juvenile court to make several dispositions of a dependent child other than placing the child for adoption with a termination of parental rights. Since Hunley, this court has consistently held that a juvenile court must determine whether any of the alternatives listed in § 12-15-71(a) are viable before deciding to terminate parental rights, see Miller v.Alabama Dep't of Pensions Sec, 374 So.2d 1370
(Ala.Civ.App. 1979), and Landers v. Association forGuidance, Aid, Placement Empathy of North Alabama,Inc., 472 So.2d 1055 (Ala.Civ.App. 1985), even after the legislature adopted the 1984 Child Protection Act that is now codified at Ala. Code 1975, § 26-18-1 et seq. Brown v.Alabama Dep't of Pensions Sec, 473 So.2d 533
(Ala.Civ.App. 1985); A.R.E. v. E.S.W., 702 So.2d 138
(Ala.Civ.App. 1997); T.H. v. State Dep't of Human Res.,740 So.2d 1089 (Ala.Civ.App. 1998); and W.L.H. v.B.L.M., 829 So.2d 173, 174 (Ala.Civ.App. 2002). Our supreme court has also repeatedly declared that a juvenile court must exhaust all viable alternatives before terminating parental rights. See Ex parte Brooks, 513 So.2d 614 (Ala. 1987);Ex parte Ogle, 516 So.2d 243 (Ala. 1987); Ex parteBeasley, 564 So.2d 950 (Ala. 1990); Ex parte F.P.,857 So.2d 125 (Ala. 2003); Ex parte J.R., 896 So.2d 416
(Ala. 2004); and Ex parte T.V., supra.
Section 12-15-71(a)(3)c, Ala. Code 1975, presently provides that a juvenile court *Page 1002 
may transfer legal custody of a dependent child to "[a] relative . . . who, after study by the Department of Human Resources, is found by the court to be qualified to receive and care for the child." Section 12-15-1.1, Ala. Code 1975, provides that a juvenile court should "preserve and strengthen the child's family whenever possible" and should maintain "a preference at all times for the preservation of the family." Ala. Code 1975, § 12-15-1.1(1) (8). In addition, § 12-15-62, Ala. Code 1975, creates a preference in favor of awarding custody to a suitable relative over an unrelated caregiver in cases in which a child has been in long-term foster care. See Ex parte W.T.M., 851 So.2d 55
(Ala.Civ.App. 2002) (construing Ala. Code 1975, § 12-15-62(c)).
Our cases have not exhaustively defined the qualifications a relative must possess in order to be considered a suitable person to take custody of a dependent child under these various statutes. However, the law is clear that, at a minimum, the relative must have the resources and capabilities to protect the children from the harm posed by the parental relationship. For example, in M.H.J. v. State Department of HumanResources, 785 So.2d 372 (Ala.Civ.App. 2000), the court held that a grandmother who had failed to detect obvious signs of neglect affecting the health of her grandchildren, and who had indicated that she might allow the father, who was serving a prison sentence for child abuse, to resume custody once he was free, was an unsuitable relative resource.
In this case, the maternal grandmother indicated by her testimony that she would indeed protect the children from any harm she perceived, including harm from the mother. However, it is undisputed that the maternal grandmother did not detect any signs of the child abuse of which the mother was convicted even though the maternal grandmother regularly cared for the children and later admitted that the signs of physical trauma were obvious. It is also undisputed that the grandmother failed to direct her oldest daughter to prevent the mother from obtaining custody of the children when the maternal grandmother was hospitalized in September 2004. That evidence clearly and convincingly proved that the maternal grandmother lacked the necessary faculties and judgment to protect the children from the dangers of physical abuse by the mother.
The mother argues that the juvenile court relied exclusively on past events and did not consider the grandmother's current living conditions as required by V.M. v. State Departmentof Human Resources, 710 So.2d 915, 921 (Ala.Civ.App. 1998). The mother misconstrues the holding in that case. InV.M., a grandmother expressed a willingness and ability to be considered a relative resource, but DHR failed to conduct any home evaluation or other investigation to determine her suitability. The DHR representative testified that DHR had rejected the grandmother because years earlier she had been unwilling to take the children, because a placement of another child with her had been unsuccessful, and because the grandmother did not have the time to care for the child. The court reversed the juvenile court's judgment finding the grandmother unsuitable because DHR had not adequately investigated the grandmother's current situation. The crux of the holding in V.M. is that the juvenile court had impermissibly based its decision entirely on past circumstances that had changed by the time of the termination hearing.
In this case, some of the grandmother's past circumstances had changed. She had moved into a new house and her leg wound had healed. However, neither change was material. The children were not removed *Page 1003 
from the maternal grandmother's home because of her housing arrangement or her health problems. The juvenile court had ordered the children to be removed from the maternal grandmother's home after she had allowed the mother to regain custody of the children. At the termination hearing, the maternal grandmother testified that she had no plan for the care of the children in case of an emergency and that she could not say how she would prevent the mother from getting the children in such an event. The grandmother also indicated that she trusted the mother and that she believed the mother had substantially changed the behavior that had led to the removal of the children from the mother's home. Those statements indicate that the maternal grandmother still lacks adequate faculties and judgment to protect the children from the mother and the potential harm arising from their interaction. Unlike the situation in V.M., the same conditions that rendered the maternal grandmother an unsuitable custodian in 2004 still persisted at the time of the termination hearing in this case.
Based on the evidence contained in the record, we conclude that the juvenile court did not err in finding that transferring custody of the children to the maternal grandmother was not a viable alternative to termination of the mother's parental rights. Because the mother presents no other ground for reversal, we affirm the judgment.
AFFIRMED.
THOMPSON, P.J., and PITTMAN and THOMAS, JJ., concur in the result, without writing.
BRYAN, J., concurs in the result, with writing.
BRYAN, Judge, concurring in the result.
I do not believe that the juvenile court erred when it found that the maternal grandmother was not a viable alternative to termination of the mother's parental rights.