7 So.3d 346 (2008)
T.V.
v.
B.S.
2061022.
Court of Civil Appeals of Alabama.
June 6, 2008.
Certiorari Denied October 24, 2008 Alabama Supreme Court 1071294.
T. Mark Maclin of Wilmer & Lee, PA, Athens, for appellant.
Brian C.T. Jones, Athens, for appellee.
*347 PER CURIAM.
On January 13, 2005, the Limestone Juvenile Court terminated the parental rights of T.V. ("the mother") to her then six-year-old son, N.V. ("the child"). The mother appealed to this court, and on October 7, 2005, we affirmed the judgment, without an opinion. T.V. v. B.S. (No. 2040406, October 7, 2005), 975 So.2d 1024 (Ala.Civ.App.2005) (table). The mother petitioned for, and the Alabama Supreme Court granted, certiorari review.
In Ex parte TV, 971 So.2d 1 (Ala.2007), the supreme court reversed the judgment terminating the mother's parental rights, holding that the juvenile court had erred when it "failed to find by clear and convincing evidence that there was no viable alternative to terminating [the mother's] parental rights." 971 So.2d at 2. The court remanded the cause directly to the juvenile court "for a full consideration of viable alternatives to terminating ... [the mother's] parental rights." 971 So.2d at 10. On remand, the juvenile court held a hearing, considered viable alternatives to terminating the mother's rights, and again entered a judgment terminating the mother's parental rights, specifically concluding that there was no viable alternative to the termination. The mother now appeals to this court from that judgment.
The facts underlying the first termination proceeding were stated by our supreme court in Ex parte T.V., 971 So.2d at 2-3:
"[The mother] began using drugs in the 1980s and became addicted to crack cocaine in the 1990s. She continued to use crack cocaine while she was pregnant with [the child], her second child, who was born on June 2, 1999. While she was pregnant with [the child], [the mother] sought assistance from the Department of Human Resources (`DHR') because, as a result of her drug addiction, she was homeless, was without employment or transportation, and was unable to perform her parental duties. She was also facing criminal misdemeanor charges.
"Shortly after [the child's] birth, DHR filed a dependency petition with regard to [the child] because of concerns about [the mother's] homelessness, drug use, and incarceration pending the criminal charges. [The child] was adjudicated dependent, and an agreement was reached among [the mother], DHR, and B.S., an acquaintance of [the mother's], that B.S. would have physical custody of [the child] and that [the mother] would be allowed visitation as agreed between B.S. and [the mother]. There was a one-year period following the adjudication of dependency during which DHR attempted to reunite [the mother] and [the child]. DHR prepared an individual service plan (`ISP') addressing [the mother's] housing and drug problems, but it could not prepare a home study because [the mother] was homeless. [The mother] failed to comply with drug treatment recommended by the ISP; instead, she agreed to the permanent placement of [the child] with B.S. The next year, the trial court with jurisdiction over the dependency petition vested permanent legal and physical custody of [the child] in B.S.. with [the mother's] consent, although the trial court retained jurisdiction to reopen the custody award. The award of permanent custody marked the end of DHR's involvement in the case; at that time [the mother] was still addicted to crack cocaine.
"Both the court's order and the record in the termination-of-parental-rights case establish that [the mother] has now met the goals DHR originally set for her. She is no longer homeless, and she *348 has dealt with her drug problem. She reconciled with and married D.R.V., the father of her first child. Through involvement with their church, [the mother] and D.R.V. have quit using illegal drugs. [The mother] testified that she has been drug-free since July 20, 2002. [The mother] ministers to people with substance-abuse problems. She has maintained employment since July 20, 2002, with short interruptions. She has voluntarily contributed small amounts to [the child's] support; these amounts total $270 since 2004.
"[The mother] testified that she first attempted to reestablish visitation with [the child] in 2002. She asserts that she understood that `B.S. was willing to help her in raising her son during the period of her drug addiction but would be willing to help facilitate the reunification of mother and child should [the mother] overcome her drug addiction.' [The mother's] brief at 8-9. However, according to [the mother], B.S. and her husband, C.S., discouraged the reunification, not returning [the mother's] telephone calls or responding to notes [the mother] left at B.S.'s house. On `numerous occasions,' [the mother] claims, she went to B.S.'s residence to see [the child], but B.S. would leave the residence with him and not allow [the mother] to visit him. C.S. testified, to the contrary, that [the mother] visited [the child] only four to six times from 1999 to 2000, and that, from 2000 until the petition was filed in March 2004, she did not visit at all.
"Believing that B.S. was resisting her efforts to reunite with [the child], [the mother] moved the trial court for visitation rights; the trial court awarded her one hour of supervised visitation each week. In March 2004, B.S. filed in the trial court the current petition to terminate [the mother's] parental rights.
[The mother] moved the court for additional visitation, but it terminated her parental rights before ruling on her motion."
On remand from the supreme court, the juvenile court held a hearing on May 7, 2007. The evidence established that the child had, since he was 5 days old, lived with B.S., C.S., and their two daughters, who were 6 and 10 years old at the time of the remand hearing. The child believes that B.S. and C.S. are his parents and that their daughters are his sisters. He has not been told that T.V. is his biological mother, and he has not asked why his surname is the same as hers. C.S. and B.S. both testified that they believed that it is not in the child's best interest to visit with the mother. C.S. stated that the mother had "shown a constant disregard for the child," and he questioned whether the mother could do anything for the child "other than confuse him even more."
B.S. presented evidence indicating that two years earlier, during the period when the judgment terminating the mother's parental rights was on appeal, the mother had been arrested for driving under the influence of alcohol ("DUI") and had been convicted of the amended charge of reckless endangerment. The mother testified that she had overcome her drug problem, and she insisted that she did not have an alcohol problem. She estimated that she had drunk alcohol in moderation only four to six times during the previous two years. She testified that on the occasion of her arrest for DUI she had attended an outdoor concert where, she said, it was hot and she had "had a few beers with friends." She stated that there were no children in the car with her when she left the concert.
The mother is 45 years old, is a high school graduate, and has had 2 years of *349 college. She testified that she had lived at the same address with her husband and their 18-year-old son for the past 7 years. She and her husband married in January 2003, although, she said, they had been together for 22 years; her husband is the father of her older son. The mother is employed as a quality auditor at Matsu of Alabama, an automotive parts manufacturer, where she works the 11:00 p.m. to 7:00 a.m. shift and earns $12.50 per hour. The mother said that at Cinram, her previous place of employment, which she had recently left for better pay and better benefits, she had been subjected to drug tests numerous times and had tested "negative" each time.
The mother testified that, with one exception, she had not seen the child since December 2004. The exception was in January 2005, when she went to visit her pastor's wife, a teacher at the school the child attends. On that occasion, the mother asked B.S., who was also at the school that day, if she could speak with the child when he came out of the building at the end of the day. B.S. agreed and the mother "fold [the child] hello and asked him if he remembered [her].... [She] asked him how he was doing and that was about it." On cross-examination, the mother acknowledged that she had "held herself out to the school officials as [the child's] mother."
Susan McGrady, a protective-services caseworker for the Limestone County Department of Human Resources ("DHR"), testified that DHR had moved to intervene in the proceeding after the cause was remanded by the Alabama Supreme Court. She stated that DHR stood ready to assist with "finding viable options for the child," but, she said, she had not received any requests for assistance. The parties agreed to continue the hearing to allow for taking the depositions of two expert witnessesPam Locke, M.Ed., a licensed professional counselor, and Danny Blanchard, Ph.D., a psychologist. The juvenile court subsequently admitted the depositions in evidence.
Pam Locke testified that DHR had engaged her to supervise visitation between the mother and the child in 2004 and that the mother had paid her to conduct additional, individual sessions with the child. Locke first saw the child in the home of B.S. and C.S. on August 30, 2004, when the child was five years old. She saw the child at his school on two additional occasions in September 2004. The first of the mother's five visits with the child occurred at the DHR office on September 21, 2004. Locke said that before the first visit she had cautioned the mother to move slowly, to be patient, not to reveal her true relationship to the child, and not to pressure the child into premature intimacy. Locke testified that she had introduced the mother to the child as "a special member of [his] family." Locke said that the first visit went well, with the mother and the child giving each other "high fives," playing a card game, and reading a story together. Locke stated that she was surprised when the mother asked the child for "a hug," because that request was not in compliance with the instructions she had given the mother, but, Locke said, the child did not seem to be upset and had suffered no harm. Locke testified that she thought the mother had "pushed the limits" and had been "in a big hurry to connect with [the child]" on two other occasionsonce when the mother brought a camera to the visitation and suggested that the child "take a picture of [his] mama"but, Locke said, the child did not react to that request and Locke thought that the child might not have heard it. Locke stated that she thought a bond was forming between the mother and the child until the October 7, 2004, visit when, she said, the child informed her that B.S. had told him that he *350 could not come back for another visitation. According to Locke, the child did, however, return for another visit on October 14, at which time he said that his surname was the same as the surname of B.S.
Locke was of the opinion that introducing T.V. to the child as his mother would have a traumatic effect on the child and would necessitate extensive, long-term counseling. She said that, if the child were told that T.V. was his biological mother, he should be told when he is older; she suggested that he not be told before his preteen years. Locke acknowledged that she was not attuned to the legal rights of parents in such cases and that her primary concern was to protect the emotional state of children. When asked whether she thought it was in the child's best interest to expose him to T.V. as his mother, Locke replied that, if she discounted the "legal aspect," her answer was "no."
Dr. Blanchard testified that B.S. and C.S. had consulted him in March 2007 to discuss their concerns about the apparent intent of the mother to gain custody of the child after nine years. Dr. Blanchard met with B.S. and C.S. on two occasions for a total of two and one-half hours. He spoke with the child for a total of 20 minutes. Dr. Blanchard testified that if a child is removed from the parent figures with whom he has bonded in his early years, the child will become confused, distant, hostile, and possibly aggressive. With respect to the possibility of removing the child from B.S. and C.S., with whom the child had resided since shortly after his birth, Dr. Blanchard explained:
"This is a child that's been living with a family for nine years, no knowledge of his mother, no understanding of who she is, or his father, for that matter, biologically speaking. It would be pretty traumatic. It can work, but you're looking at long-term therapy....
"The adjustment success is poor, especially if the child begins to ask questions as to why [his biological parent] rejected [him] in the first place: `Why didn't you keep me when I was born ...? What prevented you, despite whatever problems you may have been having, from keeping me?' And it puts the parent in an uncomfortable situation too, to be fair about it."
Dr. Blanchard gave his opinion that it would be in the child's best interest to "leave well enough alone ... to stay where he is and to live a life that is conducive [to] growth and development." He testified, however, that if the child were to be told that T.V. is his mother, that revelation should come only when the child is older, perhaps when he is between 11 and 15 years of age. At that point, Dr. Blanchard said, the child, the mother, and the child's caregivers all would need therapy, which would entail "a great deal of expense, a lot of trauma, and a lot of heartbreak." Dr. Blanchard recommended against telling the child that T.V. is his mother, but he added:
"[I]f you do it and the courts overrule what I say, I would make sure that they [are] aware that this is going to be a long-term process with a lot of feelings being hurt and a lot of anger and hostility."
When Dr. Blanchard was informed that a counselor, Locke, had identified the mother to the child as "a special member of [the child's] family," Dr. Blanchard expressed disagreement with that approach, stating: "I've never experienced anything like that.... I'm not saying it is deceptive, but I don't want to mislead a little boy thinking [he is] visiting with someone and it's not [his] parent." Finally, Dr. Blanchard opined that, even if the child were told the truth about his parentage, he should continue to live with B.S. and C.S. and the *351 mother should be allowed conditional visitation, subject to her participating in therapy and abiding by a safety plan.
On July 6, 2007, the juvenile court entered a judgment containing the following findings and conclusions on the issue whether there was a viable alternative to terminating the mother's parental rights:
"Evidence presented at [a hearing on remand by the supreme court] revealed that following the termination hearing and during the appellate process the mother was arrested for Driving Under the Influence of Alcohol and pleaded guilty to the amended charge of Reckless Endangerment. [The mother's] family was examined to determine if there were viable family alternatives to raise [the child] but most lived in other states and had never had any contact with the child and very little contact with [the mother]. No family member of the mother's came before the Court offering their home for the child. Eight years after the petition for dependency was filed, [the mother] gave the name of [the child's] father despite the record reflecting that paternity was inquired into and testing was done when the case began in 1999. The Court was not furnished with viable family alternatives in the newly divulged putative father's family.
"Dr. Danny Blanchard's deposition reflects that in his expert opinion it would not be in the child's best interest to take the child out of the home [of B.S. and C.S.] and visitation with his mother at this time in the child's life would require `a great deal of expense, a lot of trauma, and a lot of heartbreak.' Pam Locke, the child's counselor, stated that it would have a very traumatic effect on [the child] if he were to discover that [B.S. and C.S.] were not his parents and that someone else is his mother. Ms. Locke testified that her recommendation would be to wait until the child is older to confront the child with transitioning [the mother] into his life.
"Based on full consideration of clear and convincing evidence presented [on remand], the Court finds that there are no viable alternatives to the termination of parental rights of the mother. Expert testimony has been provided to the Court that return of custody of the child to the mother is not in the child's best interests and that letting the child stay with [B.S. and C.S.] and visiting with his mother would be traumatic and disruptive to the child at this time. It would appear that that arrangement is not a viable alternative to termination because in JU-99-127.01 in addition to the mother's request for visitation she also asks for the child's custody to be returned to her and that motion remains pending so that it is not an alternative for the `status quo' to remain unchanged.
"In addition, the Court does not find that letting [the mother] have visitation with [the child] while remaining in the custody of [B.S. and C.S.] is a viable alternative to terminating her parental rights. On pages 33, 41, and 54 of her deposition, Ms. Locke testified that [the mother] was not fully compliant with the counselor's recommendations regarding visitation procedures needed for the child. The Court also has concerns regarding [the mother's] ability to pay for the long-term and intensive counseling and therapy that has been recommended if visitation and reintegration of [the child] into her life continued."

Standard of Review
Appellate review of a juvenile court's decision concerning the existence of a viable alternative to termination of parental *352 rights is governed by the following principles:
"The determination of whether a viable alternative to termination of parental rights exists is a question of fact to be decided by the juvenile court. See Ex parte J.R., 896 So.2d 416 (Ala.2004). On appeal from ore tenus proceedings in a termination-of-parental-rights case, this court presumes that the juvenile court's factual findings regarding viable alternatives are correct. See J.C. v. State Dep't of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007). However, because of the serious nature of a judgment severing a familial relationship, see L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App. 2002), this court conducts a `careful search of the record' to determine whether such findings are supported by clear and convincing evidence. In re Moore, 470 So.2d 1269, 1270 (Ala.Civ. App.1985). See also Columbus v. State Dep't of Human Res., 523 So.2d 419, 421 (Ala.Civ.App.1987); and Santosky v. Kramer, 455 U.S. 745 (1982). `Clear and convincing evidence' is `"[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion."' L.M. v. D.D.F., 840 So.2d at 179, citing in turn Ala.Code 1975, § 6-11-20(b)(4)."
J.B. v. Cleburne County Dep't of Human Res., 991 So.2d 273, 282 (Ala.Civ.App. 2008).

Analysis
In Ex parte T.V., our supreme court decided that the juvenile court's finding that the child was dependent and the juvenile court's conclusion that the statutory grounds for termination outlined in § 26-18-7, Ala.Code 1975, had been proven were not plainly and palpably wrong. 971 So.2d at 6. The supreme court determined, however, that preserving the status quowith B.S. and C.S. maintaining custody while the mother visits and tries to establish a bond with the childmight be a viable alternative to termination of the mother's parental rights that the juvenile court had not considered. The supreme court reached that decision based on the following evidence and argument presented at the first termination proceeding:
"The only expert testimony was that [the mother] was making progress in establishing her relationship with [the child], that a bond appeared to be emerging between them, and that a strong relationship could grow if it were nurtured. Further, the child's guardian ad litem argued that she did not believe it to be in [the child's] best interests to terminate [the mother's] parental rights. She pointed out that [the child] had, in effect, two families attempting to meet his needs and to give him affection. She also pointed out that an alternative to terminating [the mother's] parental rights was to maintain the status quo, by which she meant that visitation would continue while permanent legal and physical custody would remain in B.S."
971 So.2d at 8. The supreme court, therefore, remanded the cause to the juvenile court "for a full consideration of viable alternatives to terminating ... [the mother's] parental rights." 971 So.2d at 10. The juvenile court's judgment on remand indicates that it fully considered viable alternatives to terminating the mother's parental rights and concluded that preserving the status quo was not a viable alternative because it was not in the child's best interest.
The evidence at the hearing on remand demonstrated that both Dr. Blanchard and Locke believed that it would be traumatic *353 for the child even to learn that T.V. was his mother, much less to be removed from the custody of B.S. and C.S., with whom he had lived for all of his nine years. Both experts opined that it would not be in the child's best interest to be told of his true parentage at the present time and recommended that, if the child were ever told, he should be told during his preteen years or when he is 11 to 15 years of age. Dr. Blanchard's testimony implied that visitation between the mother and the child should occur only if the child were not misled as to the mother's true identity, thereby apparently ruling out immediate visitation. Both experts agreed that whenever truthful information about the mother was imparted to the child, the revelation would cause trauma, anger, and heartbreak to the child and would necessitate extensive and expensive therapy, not only for the child, but also for the mother as well as for B.S. and her family members.
The ore tenus presumption of correctness does not apply to the juvenile court's assessment of the testimony of Dr. Blanchard and Locke because they testified by deposition and the juvenile court did not have the opportunity to observe their demeanor firsthand. See Safeway Ins. Co. v. Bailey, 748 So.2d 218, 221 (Ala.Civ.App. 1999). Nevertheless, the juvenile court was entitled to accord great weight to the testimony of the two mental-health professionals because they each independently reached the same conclusion with respect to the viability of continuing the status quoi.e., allowing the mother to visit the child and to try to develop a bond with him while B.S. and C.S. maintained custody; both experts determined that that course of action was not in the child's best interests. Moreover, the juvenile court expressed doubt as to whether the status quo could be maintained in light of the mother's pending motion for a return of custody and the mother's "hurry to connect with [the child]" in disregard of Locke's instructions not to reveal her true relationship to the child and not to pressure the child into premature intimacy.
We conclude that the juvenile court considered and rejected, based on the clear, convincing, and uncontroverted evidence of two experts, the alternative of allowing the mother to visit the child while he remained in the custody of B.S. and her family because that alternative would not be in the child's best interests. It is axiomatic that an alternative to termination cannot be "viable" unless it promotes the best interests of the child. See D.M.P. v. State Dep't of Human Res., 871 So.2d 77, 97 (Ala.Civ.App.2003) (plurality opinion) (rejecting two individuals as viable alternatives to termination of parental rights because, among other things, there was no evidence indicating that those individuals had ever visited or had any relationship with the child, that they would be fit custodians for the child, or that "such a placement would be in the child's best interest" (emphasis added)). See also J.C. v. State Dep't of Human Res., 986 So.2d 1172, 1196 (Ala.Civ.App.2007) (rejecting as a viable alternative to termination an individual who had "never showed a willingness to care for the child and did not testify at the termination hearing"); J.B. v. Jefferson County Dep't of Human Res., 869 So.2d 475, 484 (Ala.Civ.App.2003) (plurality opinion) (rejecting paternal great-aunt and great-uncle as viable alternatives because they waited two years to indicate their wish to be considered as custodians and, in the meantime, the child "had formed a de facto parent-child relationship with his foster parents, who desired to adopt him and who he knew as his `mama' and `daddy'"); B.S. v. Cullman County Dep't of Human Res., 865 So.2d 1188, 1196-97 (Ala.Civ.App. 2003) (rejecting sister of mother's second *354 husband as a viable alternative because the child was unfamiliar with husband's sister and other members of husband's family, sister was first mentioned by mother as possible alternative at termination hearing itself, and mother's last-minute questioning of husband's sister to determine whether she would be willing to serve as a placement for child was not sufficient to demonstrate that she was a viable alternative); and Z.G. v. State Dep't of Human Res., 717 So.2d 801, 803 (Ala.Civ.App.1998) (dismissing maternal uncle as a viable alternative because he had declined to serve as a custodian 10 years earlier and the children had had no contact with him in the meantime).
As in A.J.H.T. v. K.O.H., 983 So.2d 394 (Ala.Civ.App.2007), the mother has evidently overcome a drug dependency and succeeded in improving her life, but her absence from the life of the child for four and one-half years has a consequence. As Judge, now Justice, Murdock stated in his dissent in K.W.J. v. J.W.B., 933 So.2d 1075, 1081 (Ala.Civ.App.2005), rev'd, 933 So.2d 1081 (Ala.2005):
"[C]hildren grow. They are read to and tucked in at night. They are nursed to health. They are taught. They are nurtured. They are loved. And they love back. And bonds are formedbut not with a [mother] who has allowed [herself] to remain absent from the [children's lives]."
(Quoted in A.J.H.T., 983 So.2d at 402.) In A.J.H.T., the children were old enough at the time their mother abandoned them to know her and to have been detrimentally affected by her prolonged absence. In the present case, the child has never known his mother, and her reappearance in his life after a total absence would, according to the clear and convincing testimony of two experts, not be in his best interests. We therefore affirm the judgment of the Limestone Juvenile Court concluding that there is no viable alternative to terminating the mother's parental rights.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, J., concur.
BRYAN and THOMAS, JJ., concur specially.
MOORE, J., concurs in the result, with writing.
BRYAN, Judge, concurring specially.
I agree with the main opinion. I also agree with the analysis set forth in Judge Thomas's special writing and, therefore, join her writing. I reiterate my contentions as to our appellate courts' current jurisprudence regarding the viable-alternatives prong of Ex parte Beasley, 564 So.2d 950 (Ala.1990), as stated in my special writing in A.D.B.H. v. Houston County Department of Human Resources, 1 So.3d 53, 64 (Ala.Civ.App.2008) (Bryan, J., concurring specially).
THOMAS, Judge, concurring specially.
I agree that the juvenile court's judgment terminating the mother's parental rights should be affirmed. The juvenile court concluded that grounds for termination existed and it determined, after a full consideration of possible viable alternatives to termination, that none existed. I write specially to outline the development of our "viable alternatives" jurisprudence and to suggest that it is not in accord with current statutory law and does not facilitate the expeditious resolution of dependency cases.
In recent years, several members of the appellate bench have questioned the soundness of the no-viable-alternative prong of the termination-of-parental-rights test adopted by our supreme court in Ex *355 parte Beasley, 564 So.2d 950 (Ala.1990). See, e.g., A.D.B.H. v. Houston County Dep't of Human Res., 1 So.3d 53, 64 (Ala. Civ.App.2008) (Bryan, J., concurring specially, joined by Thomas, J.), and 1 So.3d at 67 (Thomas, J., concurring specially), and 1 So.3d at 68 (Moore, J., concurring in part and concurring in the result); M.E. v. Shelby County Dep't of Human Res., 972 So.2d 89, 101-02 (Ala.Civ.App.2007) (plurality opinion authored by Moore, J.); D.M.P. v. State Dep't of Human Res., 871 So.2d 77, 85-95 (Ala.Civ.App.2003) (plurality opinion authored by Murdock, J.). See also Ex parte A.M.P., 997 So.2d 1008, 1024 (Stuart, J., concurring specially, joined by Smith, J.) 997 So.2d at 1025 (Smith, J., concurring specially, joined by Cobb, C.J., and Stuart, J.); and Ex parte F.P., 857 So.2d 125, 144 (Ala.2003) (Stuart, J., dissenting).
The no-viable-alternative formulation appears to have been derived from Roe v. Conn, 417 F.Supp. 769 (M.D.Ala.1976). In Conn, the federal district court for the Middle District of Alabama, when faced with a challenge to the constitutionality of Alabama's child-neglect statute, used a strict-scrutiny analysis "to address the `compelling state interest' in alleviating the `real and substantial harm' of a child's remaining in the custody of an unfit parent." D.M.P., 871 So.2d at 89 (quoting Conn, 417 F.Supp. at 779-80). The Conn court explained:
"The State's interest ... would become `compelling' enough to sever entirely the parent-child relationship only when the child is subjected to real physical and emotional harm and less drastic measures would be unavailing."
417 F.Supp. at 779 (emphasis added).
This court later incorporated the less-drastic-measures formulation from Conn into its termination-of-parental-rights jurisprudence. See Miller v. Alabama Dep't of Pensions & Sec., 374 So.2d 1370 (Ala. Civ.App.1979). In Miller, this court noted that, when the State seeks to terminate parental rights, there are often "less drastic measures than permanent removal of parental custody," and it listed the following things as examples of less drastic measures:
"returning the child to parental custody on a trial basis subject to certain definite conditions being met and subject to supervision by [Department of Pensions and Security] workers or other trained personnel; or temporary custody in a foster home with specific visitation with the child and conduct requirements to be met by parents; or that the parents are to be deprived of custody temporarily pending a correction of deficiencies in the home environment that were having or would have a harmful effect on the child should the child be placed back in the family relationship."
Miller, 374 So.2d at 1374. Today, an Alabama court would characterize the Miller court's list of "less drastic measures" as examples of
"`reasonable efforts' ... made to preserve and reunify families prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home, and to make it possible for a child to return safely to the child's home."
§ 12-15-65(m), Ala.Code 1975 (emphasis added). See also § 12-15-65(g), Ala.Code 1975, and § 26-18-7(a)(6), Ala.Code 1975. When Miller was decided, however,
"there was (1) no statutory requirement that the State employ the `le[ast] drastic measures' available to remedy a child's dependency and (2) no statutory requirement that [the Department of Human Resources (`DHR')] make reasonable efforts to reunify a dependent child *356 with its parents before attempting to terminate parental rights.11
#11 The [Child Protection Act], with its reference to `reasonable efforts ... toward the rehabilitation of the parents,' see Ala.Code 1975, § 26-18-7(a)(6), was enacted in 1984, well after Miller was decided. As originally enacted, Ala. Code 1975, § 12-15-65 did not contain the current subsections (g) and (m), which discuss DHR's obligation to make reasonable efforts to preserve and reunify families under most circumstances. Subsection (g) was added in 1995, see Ala. Acts 1995, Act No. 95-545, and subsection (m) was added in 1998. See Ala. Acts 1998, Act No. 98-372."
D.M.P., 871 So.2d at 90.
Under current statutory law, the Department of Human Resources ("DHR") is required to use reasonable efforts to rehabilitate a parent in order to make it possible for the parent and the child to be reunited. See § § 12-15-65(g) and (m), Ala.Code 1975. Accordingly, to the extent that the second prong of the Beasley test addresses matters that are now known as "reasonable efforts," that prong of the test is superfluous because those matters will already have been addressed in analyzing whether the first prong of the Beasley test has been satisfied. That is to say, in determining whether there are grounds for termination, a juvenile court must consider whether "reasonable efforts by [DHR] or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed," 26-18-7(a)(6), Ala.Code 1975. In the instant case,
"[t]here was a one-year period following the adjudication of dependency during which DHR attempted to reunite [the mother] and [the child]. DHR prepared an individual service plan (`ISP') addressing [the mother's] housing and drug problems, but it could not prepare a home study because [the mother] was homeless. [The mother] failed to comply with drug treatment recommended by the ISP; instead, she agreed to the permanent placement of [the child] with B.S. The next year, the trial court with jurisdiction over the dependency petition vested permanent legal and physical custody of [the child] in B.S., with [the mother's] consent."
Ex parte T.V., 971 So.2d 1, 3 (Ala.2007).
"Notably, [the mother] never challenge[d] the sufficiency of DHR's reunification efforts in the first 18 months of [the child's] life. Instead [the mother] argue[d] that DHR should have reinstated those efforts in December 2003, when she filed for visitation and `ultimately the return of custody.'"
Ex parte T.V., 971 So.2d at 19 (Smith, J., dissenting, joined by Stuart and Bolin, JJ.). Reasonable efforts, deemed under former statutes to be a viable alternative to termination, are now, under current statutes, required as a precondition to termination. Obviously, the meaning of a "viable alternative" has changed over the years.
More recently, the phrase "viable alternative" has come to mean a placement resource for a child who has been removed from his parenta person or an entity that can serve as a custodian for the child while the parent strives to complete a plan of rehabilitation aimed at ultimate reunification with the child. See, e.g., V.M. v. State Dep't of Human Res., 710 So.2d 915 (Ala.Civ.App.1998) (recognizing that placing a child with a fit and willing relative is a viable alternative to terminating parental rights).
As Judge Moore pointed out in his special writing in A.D.B.H. v. Houston County Department of Human Resources, supra, *357 however, our statutory law has, since 1998, required the juvenile court to determine before the termination-of-parental-rights adjudicatory proceeding whether placement of a child with a relative or other suitable custodian is a viable alternative to termination. A.D.B.H., 1 So.3d at 68 (Moore, J., concurring in part and concurring in the result). Section 12-15-62(c), Ala.Code 1975, requires that determination to be made at a permanency hearing.
"When the legislature amended the Alabama Juvenile Justice Act (`the AJJA'), Ala.Code 1975, § 12-15-1 et seq., in 1998 to comply with the Adoption and Safe Families Act (`the ASFA'), 42 U.S.C. § 671 and § 675, it mandated that juvenile courts hold a permanency hearing to determine a child's disposition within 12 months of the date the child first entered foster care. See Ala. Code 1975, § 12-15-62(c). In a permanency hearing, the juvenile court is to `determine' which of several custodial arrangementsreturn to the parent, referral for termination of parental rights and adoption, or placement with a relative or other legal custodian`shall be' the permanency plan. Id. The purpose of requiring the 12-month permanency hearing is to comply with the policy behind the ASFA to ensure `that children are provided a permanent home as early as possible.' Kurtis A. Kemper, Annotation, Construction and Application by State Courts of the Federal Adoption and Safe Families Act and Its Implementing State Statutes, 10 A.L.R.6th 173, 193 (2006).
"Based on the plain language of § 12-15-62(c), a juvenile court must, in a permanency hearing, determine the issues of whether a `fit and willing' relative i.e., someone who is `qualified to receive and care for the child,' § 12-15-71(a)(3)c.exists and whether placement with that relative serves the best interests of the child. Otherwise, the juvenile court could not make a determination as to whether relative placement should be the permanency plan for the child as required under § 12-15-62(c). Hence, the AJJA now expressly states that the determination of the viability of relative placement should take place in a proceeding separate from the hearing to determine whether grounds for termination of parental rights exist.

"Section 12-15-62(c) specifically requires a juvenile court to hold at least one permanency hearing within 12 months of when the child enters foster care; however, nothing in the law prohibits a juvenile court from holding more than one permanency hearing. Thus, if, after the original permanency hearing, an interested party asserts that a material change of circumstances has occurred and that the permanency plan in effect is no longer in the best interests of the child, a juvenile court may conduct another permanency hearing for the purposes of reviewing the permanency plan and, if appropriate, modifying it. For example, if an interested party asserts on the eve of the termination hearing that placement with a relative has become a viable alternative due to intervening circumstances occurring since the last permanency hearing, the juvenile court may order another permanency hearing to immediately precede the hearing on the termination of parental rights. Upon proper notice to the parties, the juvenile court may bifurcate the trial by deciding, first, in the dependency action, the viability of relative placement, i.e., whether the relative is `fit and willing' and `qualified to receive and care for the child' and whether such placement would serve the child's best interests, and then, if still *358 necessary, deciding, second, in the termination action, whether grounds for termination exist. However, under no circumstances does § 12-15-62(c) authorize a juvenile court to determine the question of the viability of relative placement during the adjudicatory phase, which is dedicated solely to determining whether grounds for termination exist."
A.D.B.H., 1 So.3d at 69-70 (Moore, J., concurring in part and concurring in the result) (emphasis added; footnotes omitted). In the instant case, the juvenile court did what § 12-15-62(c) requires. It held a permanency hearing in December 2000, and, with the mother's consent, it "vested permanent legal and physical custody of [the child] with B.S." Ex parte T.V., 971 So.2d at 3. Following Judge Moore's A.D.B.H. analysis, the mother's 2004 motion for additional visitation rights and a return of custody could be deemed a motion for review and modification of the permanency plan.
I believe that the manner in which Alabama appellate courts have been addressing the second prong of the Beasley test neither comports with statutory requirements nor facilitates the expeditious resolution of dependency cases. Even if this court were to reassess and to overrule, if necessary, our own prior decisions that requireat a termination-of-parental-rights adjudicatory proceedingclear and convincing proof that there is no viable alternative to the termination, we have no authority to overrule decisions of the Alabama Supreme Court. See § 12-3-16, Ala.Code 1975. I urge our supreme court to reevaluate its prior decisions with respect to the secondno-viable-alternativeprong of the Beasley test in light of the Alabama Juvenile Justice Act, § 12-15-1 et seq., Ala.Code 1975, and the Child Protection Act, § 26-18-1 et seq., Ala. Code 1975.
BRYAN, J., concurs.
MOORE, Judge, concurring in the result.
At this point in our jurisprudence, the origin of the "viable alternatives" prong of the Ex parte Beasley, 564 So.2d 950 (Ala. 1990), test is well-documented. See D.M.P. v. State Dep't of Human Res., 871 So.2d 77, 85-92 (Ala.Civ.App.2003) (plurality opinion); N.J. v. Madison County Dep't of Human Res., 980 So.2d 997, 1001 (Ala. Civ.App.2007) (plurality opinion); and Ex parte F.P., 857 So.2d 125, 144 (Ala.2003) (Stuart, J., dissenting). In summary, the "viable alternatives" requirement stems from the recognition that the Due Process Clause of the United States Constitution protects the fundamental rights of parents to the care, custody, and control of their children by precluding states from completely and permanently severing those rights when "less drastic measures" can be implemented. See Roe v. Conn, 417 F.Supp. 769, 779-80 (M.D.Ala.1976). Accordingly, as Ex parte Beasley later stated it, a juvenile court may terminate parental rights only after it has considered and rejected all viable alternatives to termination.
Even before this principle was first applied in an Alabama appellate court opinion, the legislature had adopted the 1975 Alabama Juvenile Justice Act ("the AJJA"). See Ala. Acts 1975, Act No. 75-1205, p. 2384, which is still in effect, as modified, today. See Ala.Code 1975, § 12-15-1 et seq. In Lovell v. Department of Pensions & Security, 356 So.2d 188 (Ala. Civ.App.1978), and Miller v. Alabama Department of Pensions & Security, 374 So.2d 1370 (Ala.Civ.App.1979), this court concluded that the legislature had incorporated the concept of "viable alternatives" *359 into the AJJA by giving juvenile courts the power to choose among several disposition options to protect the welfare of a dependent child, see Ala.Gode 1975, § 12-15-71, including the authority to make any order that the juvenile court deems to be in the welfare and best interests of the child. Ala.Code 1975, § 12-15-71(a)(4).
Although it is true that § 12-15-71 does acknowledge the authority of the juvenile court to dispose of the custody of a dependent child in any number of ways other than termination of parental rights, the AJJA does not expressly mandate that the juvenile court refrain from terminating parental rights if some other less drastic alternative is viable. Instead, the AJJA states that the juvenile court may make any disposition order that protects the welfare of the child and serves the best interests of the child. See Ala.Code 1975, § 12-15-71(a) & § 12-15-71(a)(4). Nothing in the language of the AJJA implies that if the child would be protected and its best interests served by a termination of parental rights, a juvenile court must nevertheless analyze the other statutory options before proceeding to a hearing to terminate parental rights. If anything, the Lovell and Miller courts read that requirement into the AJJA to assure its constitutionality. See Almon v. Morgan County, 245 Ala. 241, 246, 16 So.2d 511, 516 (1944) ("A statute may be enacted without containing [a] provision for constitutional requirements but in such terms as not to exclude them and to justify the court in holding that it was intended to be subject to those requirements, which should then be treated as a feature of it.").
In 1984, the legislature adopted the Child Protection Act ("the CPA"), Ala. Acts 1984, Act No. 84-261, p. 442, which is now codified at Ala.Code 1975, § 26-18-1 et seq. The predominant purpose of the CPA is to "provide meaningful guidelines to be used by the juvenile court in cases involving the termination of parental rights." Ala.Code 1975, § 26-18-2. The CPA states, in pertinent part:
"If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents."
Ala.Code 1975, § 26-18-7(a). As has been repeatedly pointed out, the CPA does not explicitly require a juvenile court to consider all other viable alternatives as a prerequisite to the termination of parental rights. See D.M.P. v. State Dep't of Human Res., 871 So.2d at 85; Ex parte F.P., 857 So.2d at 144.
However, the legislature has also declared that one of the fundamental purposes of the juvenile courts is "to preserve and strengthen the child's family" and "[t]o reunite a child with his or her parents as quickly and safely as possible when the child has been removed from the custody of his or her parents." Ala.Code 1975, § 12-15-1.1(1) & (3). Pursuant to those goals, § 26-18-7(a)(6) specifically requires juvenile courts, when determining whether to terminate parental rights, to consider whether reasonable efforts undertaken by state agencies to rehabilitate the parent have failed. Section 26-18-7(b) also requires juvenile courts to consider the parent's lack of effort to adjust to the child's needs in accordance with agreements reached with state agencies in administrative and judicial reviews. The entire thrust of these provisions is to assure that, before a juvenile court severs the relationship *360 between a parent and a child, reasonable efforts have been made to correct those parental deficiencies that led to the breakup of the family. See J.B. v. Jefferson County Dep't of Human Res., 869 So.2d 475 (Ala.Civ.App.2003) (plurality opinion).
Furthermore, in order to comply with the federal Adoption and Safe Families Act of 1996, see H.H. v. Baldwin County Dep't of Human Res., 989 So.2d 1094, 1098 (Ala.Civ.App.2008) (plurality opinion), the legislature has declared that, except in cases involving aggravating circumstances, see Ala.Code 1975, § 12-15-65(m)(1)-(4), a juvenile court may order that a dependent child be removed or kept from the custody of a parent only on the condition that the court find that reasonable efforts to reunite the family have been or will be undertaken or that such efforts have failed. See Ala.Code 1975, § 12-15-25(g). Obviously, a judgment terminating parental rights is an order immediately, permanently, and irrevocably divesting the parent of custody of the child, see C.B. v. State Dep't of Human Res., 782 So.2d 781, 785 (Ala. Civ.App.1998) ("termination of parental rights is an extreme action that cannot be undone; it is permanent"), so a juvenile court must comply with § 12-15-25(g) when entering such a judgment.
The constitutionality of the present statutory scheme has not been addressed in any opinions. Presumably, because this court and our supreme court continue to apply the viable-alternatives prong of the Beasley test to cases brought under the CPA, a majority of the members of our appellate courts believe that that standard should be read into the CPA in order to assure its constitutionality. Thus, even though the CPA expressly requires the juvenile court to consider only one viable alternativerehabilitation of the parent it is implied that the juvenile court must consider all viable alternatives before terminating parental rights, which would include permanent placement with a relative or other individual qualified to receive and care for the child, see Ala.Code 1975, §§ 12-15-71(a)(3)c. & 12-15-62(c), with or without visitation rights reserved to the parent, depending on the best interests of the child. See Ala.Code 1975, § 12-15-71(a)(4).
With that said, nothing in the constitution prohibits the legislature from establishing the procedure by which viable alternatives are to be identified and evaluated so long as the legislature adequately protects the constitutional rights of parents. Since 1998, see Ala. Acts 1998, Act No. 98-372, p. 677, § 1., the AJJA has required juvenile courts to conduct at least 1 permanency hearing no less than 12 months from the date a dependent child enters foster care in order to establish the custodial disposition that best serves the interests of the child. See Ala.Code 1975, § 12-15-62(c). Once the permanency plan is established, the juvenile court must use reasonable efforts to implement the plan as soon as practicable. Id. As this court recently held, in enacting this provision, the legislature intended that 12 months is a presumptively reasonable time for a juvenile court, to assess the success of the efforts of the parent to rehabilitate and to assess the reasonableness of efforts to reunite the family. See M.A.J. v. S.F., 994 So.2d 280 (Ala.Civ.App.2008). Under § 12-15-62, a juvenile court must still protect the substantive due-process rights of parents by assuring that all viable alternatives to termination are explored; however, they must do so on a expedited timetable in a specific hearing separate from the hearing to terminate parental rights. See A.D.B.H. v. Houston County Dep't of Human Res., 1 So.3d 53, 68 (Ala.Civ.App.2008) (Moore *361 J., concurring in part and concurring in the result).
In this case, the child was declared dependent due primarily to the mother's inability to care for the child because of drug abuse. The juvenile court placed the child in the temporary custody of B.S. while the Department of Human Resources ("DHR") exerted reasonable efforts to reunite the mother with the child. At the end of one year, the mother had not overcome her drug problem, so the juvenile court placed the child in the permanent custody of B.S., granting the mother visitation "as may be from time to time agreed upon between [the mother and B.S.]" In other words, the juvenile court held a permanency hearing, determined that it was in the best interests of the child to remain in the custody of B.S. without terminating the parental rights of the mother, and further determined that some visitation with the mother would be in the best interests of the child. The juvenile court implemented its plan forthwith by entering a judgment consistent with its findings. Thereafter, DHR ended its involvement in the case. If the mother had had any complaint about the reasonableness of DHR's efforts to reunite the family, the finding that her efforts to rehabilitate had been unsuccessful, the placement of the child with B.S. without consideration of other relatives, or the terms of her visitation, the mother's remedy was to appeal the judgment entered after the permanency hearing. Otherwise, those issues were finally determined, subject only to the power of the juvenile court to modify custody or visitation based upon a material change of circumstances affecting the best interests of the child. See Ala.Code 1975, § 12-15-32; Heller v. Heller, 558 So.2d 961 (Ala.Civ.App.1990); and A.D.B.H., supra.
In 2004, the mother filed a petition to modify visitation and custody. In response, B.S. filed a counterclaim seeking to terminate the mother's parental rights. The juvenile court terminated the mother's parental rights based upon clear and convincing evidence demonstrating that the mother was unable to discharge her parental responsibilities to and for the child. See Ex parte T.V., 971 So.2d 1, 5-7 (Ala. 2007). However, the juvenile court did not require DHR to reinitiate reasonable efforts to reunite the mother with the child, did not consider placing the child with the mother's relatives, and did not consider maintaining the status quo. Based on these perceived errors, the supreme court reversed the judgment. Ex parte T.V., 971 So.2d at 7-10.
I believe the juvenile court did not err in failing to order DHR to become involved in the case again. DHR's duty to use reasonable efforts to reunite the family is triggered by removal of the child from the parental home, see Ala.Code 1975, § 12-15-65(g), not the filing of a petition to terminate parental rights. By the time B.S. filed her petition to terminate the mother's parental rights, DHR had long ago discharged its statutory duty to use reasonable efforts to reunite the mother with the child by working with the mother for more than one year after the child was removed from the custody of the mother to assist the mother in overcoming her drug problem. The juvenile court had already determined that reasonable efforts at reunification had failed when it awarded permanent custody of the child to B.S. The filing of the petition to terminate the mother's parental rights did not restart the reunification process or require a reexamination of the earlier reunification efforts. Nothing in the law requires the juvenile court to order extraordinary efforts, such as restarting reunification efforts years after reasonable efforts had failed.
*362 Furthermore, once the juvenile court placed the child with B.S. and B.S. assumed proper care of the child, the child was no longer dependent and in need of state supervision. See S.P. v. E.T., 957 So.2d 1127, 1131 (Ala.Civ.App.2005) ("Under ideal circumstances, such final dispositional orders coincide with the end of the child's dependency, i.e., the child has a proper custodian `and' is no longer `in need of care or supervision' by persons other than the custodian. See Ala.Code 1975, § 12-15-1(10)n."). DHR should not become involved unless its services are necessary to protect the welfare of the child. The filing of a petition to terminate the rights of a noncustodial parent by a proper custodian does not indicate that a child is in need of protective services.
I also believe the juvenile court did not err in failing to consider placing the child with the mother's relatives. If the mother had relatives who were qualified to receive and care for the child and willing to assume the child's custody, the time and place for evaluating the possibility of placing the child with those relatives would have been years earlier at the permanency hearing. See A.D.B.H., supra. If the juvenile court failed to properly consider relative placement, which, based on the peculiar facts of this case, I do not believe happened, that mistake was subject to correction on appeal of the permanency judgment. The filing of the petition to terminate the mother's parental rights did not revive that issue.
However, the juvenile court did initially commit reversible error by deciding that maintenance of the status quo was not in the child's best interests without receiving sufficient evidence to support that finding. When the mother filed her petition to modify visitation and custody, she, in essence, asserted that the permanency plan implemented by the juvenile court was no longer serving the best interests of the child and that it would now be in the child's best interests to increase the mother's visitation and/or to award her custody. Before proceeding to a hearing on the counterclaim to terminate the mother's parental rights, the juvenile court should have conducted a hearing on the mother's petition to modify the permanency plan. See A.D.B.H., supra. At that hearing, the juvenile court would not have been considering whether grounds for termination existed; rather, it would have been deciding solely whether the permanency plan should be modified according to the best-interests standard. Id.
Instead, the juvenile court proceeded to a hearing on the counterclaim to terminate the mother's parental rights. That hearing produced some testimony and a recommendation by the guardian ad litem indicating that it was in the child's best interests to remain in the custody of B.S. with visitation by the mother. B.S. did not counter that testimony with any evidence indicating that the child's best interests would not be served by continuing the custody arrangement initially approved by the juvenile court. Nevertheless, the juvenile court terminated the mother's parental rights. It appears that by proceeding directly to the hearing to terminate the mother's parental rights, the juvenile court overlooked its responsibility to first consider whether the permanency plan in place continued to serve the child's best interests.
On remand, the juvenile court conducted a best-interests hearing. In that hearing, B.S. introduced sufficient evidence indicating that it was no longer in the child's best interests to maintain the status quo. The mother had gone so long without exercising her visitation rights that the child did not know who the mother was or that she was his mother. The expert testimony was clear and consistent that it would be disruptive and traumatic to the child to *363 reintroduce the mother to the child as his mother. Dr. Blanchard testified that it would be even worse to conceal the mother's true identity from the child. Both Dr. Blanchard and Pam Locke, the counselor, basically testified that, absent concern for the legal rights of the mother, they perceived no reason to justify continued visitation between the mother and the child. Since it is the child's best interests that control the propriety of a permanency plan, see Ala.Code 1975, § 12-15-62(c), the juvenile court correctly determined that maintaining the status quo was not a viable alternative.
The juvenile court also allowed DHR to intervene in the case and offer its services. The mother did not contact DHR at all after the remand because she did not believe DHR's services were necessary. In addition, the juvenile court considered extensive testimony regarding the mother's relatives, all of which indicated that the relatives were not qualified to receive and care for the child, as the juvenile court found. The juvenile court thus fully complied with the remand order of the supreme court; therefore, I concur in the affirmance of the juvenile court's judgment.